UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHALECE RENAE GREEN, *on behalf of* D.D.<br>    Plaintiff,<br>         v.<br>CAROLYN W. COLVIN, Commissioner of Social Security,<br>    Defendant. | No. 3:17-cv-78 (MPS) |

**RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE
DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

This is an administrative appeal following a decision by the Acting Commissioner of the Social Security Administration ("Commissioner") concluding that D.D., the minor child of Shalece Renae Green, was no longer disabled under the Social Security Act. Ms. Green contends that the Administrative Law Judge ("ALJ") erred in finding that D.D.'s impairments did not meet or medically equal a listed impairment—namely Listings 103.03C, 103.03D, and 105.08B.2. She also argues that the ALJ erred in concluding that D.D.'s impairments did not functionally equal a listed impairment. For the reasons set forth below, I conclude that the ALJ's decision was supported by substantial evidence. I therefore AFFIRM.

**I.    Background**

Ms. Green filed an application for disability benefits on behalf of D.D. on May 7, 2010. (Joint Statement of Facts, ECF No. 17-2 at 1). The Social Security Administration ("SSA") granted the application a month later. (*Id.*). The SSA subsequently conducted a redetermination of D.D.'s eligibility for disability benefits in January of 2012 and concluded that D.D. was no longer eligible for benefits as of April 12, 2012. (*Id.*). Ms. Green appealed the decision by requesting Reconsideration. (*Id.*). A hearing was scheduled before hearing officer Kira Cunningham on May 15, 2013, but Ms. Green and D.D. did not appear at the hearing. (*Id.* at 1-2). Ms. Green later contacted the hearing officer and submitted supplemental information in

1

support of her claim. (*Id.* at 2). The hearing officer concluded that D.D. was no longer disabled and affirmed the cessation of D.D.'s disability benefits. (*Id.*). Ms. Green then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.*). After conducting a hearing on April 13, 2015, at which Ms. Green and her counsel were present, ALJ Alexander Borre issued an unfavorable decision on June 23, 2015. (*Id.*).

The ALJ found that although D.D. continued to suffer from various afflictions, these impairments no longer qualified him to receive disability benefits. (ALJ Decision, ECF No. 11-3 at 32). Although the ALJ found that D.D. suffered from several severe impairments—including developmental delays, visual deficits, asthma, and low weight due to a premature birth—he ultimately concluded that none of these conditions constituted "an impairment or combination of impairments that functionally equals the listings." (*Id.* at 19). In particular, the ALJ rejected Ms. Green's claim that D.D.'s asthma matched or functionally equaled a listed impairment given its intermittent nature. (*Id.* at 22). The ALJ also concluded that D.D. did not have a marked limitation in any of the domains of functioning. (*Id.* at 24-31).

The Appeals Council denied Ms. Green's request for review on November 23, 2016, thereby making the ALJ's decision the final decision of the Commissioner. (Joint Statement of Facts, ECF No. 17-2 at 2). Ms. Green then filed this appeal. Specific facts and portions of the ALJ's decision will be discussed below as necessary.

**II.     Standard**

The SSA provides for benefits to children (individuals under the age of 18) with a disability, i.e. a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(C)(i). To determine whether a child is disabled under the SSA, an ALJ must employ a three-step process promulgated by the Commissioner. The ALJ must first inquire into whether the child is working and, if so, whether such work constitutes a "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is not engaged in a substantial gainful activity, the ALJ must then determine whether the child has a "medically determinable impairment[] that is severe" within the meaning of the regulations. 20 C.F.R. § 416.924(c). If the child has a severe impairment or combination of impairments, the ALJ must then analyze whether the impairments "meet, medically equal, or functionally equal the listings." 20 C.F.R. § 416.924(d).

In analyzing whether a child's impairment functionally equals a listing, an ALJ must inquire into whether the impairment constitutes a "'marked limitation' in two domains of functioning or an 'extreme' limitation in one domain. . . ." 20 C.F.R. § 416.926a(a). The regulations recognize a total of six domains of functioning: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for yourself; and, (vi) [h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1). An impairment constitutes a "marked" limitation in a domain when it "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An impairment is an "extreme" limitation in a domain if it "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). To determine whether a child's impairment meets one of these benchmarks, an ALJ must compare the child's performance in one of the six domains listed above to "other children [of the child's age] who do not have impairments." 20 C.F.R. § 416.926a(b).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008), quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 127, quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). Hence, "as a general matter, the reviewing court is limited to a fairly deferential standard." *Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs.*, 360 F. App'x 240, 242 (2d Cir. 2010).

## III. Discussion

### a. Listed Impairments

Ms. Green contends that the ALJ erred in determining that D.D.'s condition did not meet or medically equal a listed impairment—to wit, Listings 103.03C, 103.03D, and 105.08. (ECF No. 17-1 at 8, 11, 16).[1] In order for "a claimant to show that his impairment matches a listing,

---

[1] Ms. Green also contends that the ALJ committed a technical error by incorrectly stating that "D.D.'s medically determinable impairments at the [comparison point decision ("CPD")] . . . were developmental delays, an eye disorder, asthma, and low birth weight and that these impairments were found to functionally equal the listings because D.D. had marked limitations in moving about and manipulating objects and marked limitations in health and physical well-being." (ECF No. 17-1 at 6). Instead, Ms. Green notes that D.D. was first found disabled due only to his low birth weight. (*Id.*). She does not pursue this argument, however, for obvious reasons—the ALJ's consideration of D.D.'s other impairments could only have bolstered her case.
  Ms. Green also avers that the ALJ erred by failing to analyze "whether D.D. had any medically determinable impairments that were 'severe' as defined in the regulations." (*Id.* at 7). Instead, she argues, the ALJ merely stated that D.D. had not developed any additional impairments subsequent to the CPD, a conclusion that was "clearly wrong in that D.D. developed asthma, amblyopia, myopia, and developmental delays, including among other things a failure to thrive and impaired fine motor and gross motor skills, after the CPD." (*Id.*). The ALJ did, however, examine whether each of these impairments functionally equaled the listings since June 30, 2012, and concluded that they did not. (ALJ Decision, ECF No. 11-3 at 18-31).

4

it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Impairments that "manifest[] only some of those criteria, no matter how severe, do[] not qualify." *Id.* Hence, a child with an impairment that greatly exceeds one of the necessary criteria for a listing but falls only slightly below the other would not match the listing. *Id.* n. 8. In order "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 531 (quoting 20 C.F.R. § 416.926(a), footnote omitted). With these principles in mind, I now address each listing identified by Ms. Green in turn.

**1. 103.03C**

Ms. Green argues that the ALJ erred in determining that D.D's impairments did not meet or medically equal the requirements of Listing 103.03C (*see* ECF No. 17-1 at 8), which provided in relevant part as follows at the time of the hearing[2]:

103.03 Asthma. With:

…

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

---

Ms. Green's quibbles therefore appear to be strictly academic, because the ALJ considered each of these impairments in substance. Further, the ALJ's conclusion that D.D. had "not had an impairment or combination of impairments that [met] or medically [equaled]" the listings since June 30, 2012, (ALJ Decision, ECF No. 11-3 at 31), indicated that the ALJ did in fact consider whether D.D. had developed any impairments other than the ones noted at the CPD.

[2] *Henry v. Colvin*, 561 F. App'x 55, 57-58 (2d Cir. 2014) (looking to regulations in place at time of hearing before ALJ to determine if his decision was supported by substantial evidence). As noted above, the hearing before the ALJ took place on April 13, 2015. Listing 103.03C was substantially revised in October of 2016. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 103.03C (effective as of March 27, 2017).

5

>1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
>2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12–month period;

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 103.03C (Effective January 2, 2015 to May 17, 2015).

Ms. Green contends that D.D. was on a regular regimen of asthma medications, including sympathomimetic bronchodilators. (*See* ECF No. 17-1 at 9). She also argues that D.D. did not have extended symptom-free periods, and that his daily treatment with corticosteroid asthma medication—i.e., "Pulmicort respules" (*id.* at 10)—met the listing's requirement of short courses of corticosteroids that average more than five days per month for at least three months during a twelve-month period. Finally, she avers that D.D. took his medication at home on a daily basis. (*Id.*).

The ALJ's conclusion that D.D. did not match Listing 103.03C rested on his determination that D.D. did not have persistent low-grade wheezing or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators. (ALJ Decision, ECF No. 11-3 at 22). While the ALJ noted that D.D. experienced frequent upper respiratory infections, he found that the treatment records did not demonstrate continuous symptoms. (*Id.*). Rather, the ALJ concluded that the records showed that D.D. suffered from intermittent attacks, that he had gone several months without treatment at times, and that he showed no signs of wheezing. (*Id.*). The ALJ also observed that D.D. had "continued to be prescribed only as needed medications, with the exception of a sick plan [requiring] regular dosing of his medications over the course of several days." (*Id.*).

I conclude that substantial evidence undergirds the ALJ's findings. First, the record supports the ALJ's conclusion that D.D. did not experience an absence of extended symptom-free periods. Ms. Green concedes in her brief that that D.D.'s medical records demonstrate only

sporadic treatment for respiratory related ailments during the period in question. (ECF No. 17-1 at 9). Also, several of the treating documents in the record do not mention D.D.'s asthma, suggesting that he was, at least at some points, asymptomatic. (*See, e.g.*, ECF No. 11-8 at 116 (noting "Lungs: clear to auscultation, good air entry bilaterally"), 118 (noting "Lungs: clear to auscultation, good air entry bilaterally, no wheezes or crackles"), 120, 122 ("Lungs: clear to auscultation, good air entry bilaterally"), 124 ("Lungs: clear to auscultation, good air entry bilaterally, no wheezes or crackles"); *see also* ECF No. 11-9 at 41 ("Lungs: clear to auscultation, no wheezes or crackles"), 44, 46 ("Lungs: clear to auscultation, good air entry bilaterally"), 219 ("Lungs: clear to auscultation, good air entry bilaterally, no wheezes or crackles"). Further, the record supports the ALJ's finding that D.D. was prescribed medication for his asthma only on an as needed basis. (*See id.*; *see also* ECF No. 11-9 at 41). The various medical records indicate generally that D.D. was prescribed albuterol and a "ProAir HFA CFC" inhaler for use as necessary, along with Pulmicort Respules for use during sicknesses. (*See* ECF No. 11-8 at 116, 118, 120, 122 124; ECF No. 11-9 at 41, 43, 46, 219). This evidence also suggests that D.D.'s condition was not constantly symptomatic.

Even if Ms. Green could demonstrate that D.D. suffered from an "absence of extended symptom-free periods" with respect to his asthma, I would still affirm the ALJ's conclusion due to the substantial evidence that D.D. did not require the daytime and nocturnal use of sympathomimetic bronchodilators. While Ms. Green contends that D.D. was on a regular daily regimen of several asthma medications (ECF No. 17-1 at 9), she does not point to any evidence in the record indicating that he used these medications daily and nightly, and the records suggest he did not use them at school. (ECF No. 11-7 at 116). Also, at the hearing before the ALJ, Ms. Green was asked how often D.D. required the use of the nebulizer—she responded that "[i]t's

7

supposed to be every night." (ECF No. 11-3 at 75). She noted, however, that when D.D. was "really sick," he would use the nebulizer "every four to six hours, every day." (*Id.*). Thus, there is substantial evidence in the record that D.D. did not use a sympathomimetic bronchodilator daily and nightly as the listing requires.

For these reasons, substantial evidence supports the ALJ's determination that D.D. did not match Listing 103.03C.[3]

### 2. 103.03D

Ms. Green also argues that the ALJ erred in concluding that D.D.'s impairments did not medically equal Listing 103.03D. (ECF No. 17-1 at 11). At the time of the hearing, Listing 103.03D required asthma with "[g]rowth impairment as described under the criteria in 100.00." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 103.03D (Effective January 2, 2015 to May 17, 2015). Listing 100.00 described, in relevant part, the following criteria: "[f]all of greater than 15 percentiles in height which is sustained; or [f]all to, or persistence of, height below the third percentile." *Id.* at 100.02 (internal lettering omitted).

Ms. Green concedes that D.D.'s impairments did not match the listing but contends that D.D.'s low weight medically equaled the listing. (ECF No. 17-1 at 14-15). She also argues that the ALJ committed reversible error by failing to address this contention in detail in his opinion. (*Id.*). As an initial matter, Ms. Green is correct that the ALJ did not specifically discuss this argument in his decision. Rather, he merely noted that he had "specifically considered listings under sections 100.00 and 103.00" in determining that D.D. was not entitled to benefits, and that

---

[3] Ms. Green averred that the ALJ erred in determining that D.D.'s impairments neither "met" nor "equaled" Listing 103.03C. (ECF No. 17-1 at 8). She presents, however, no substantive argument or analysis suggesting that D.D.'s impairments medically equaled Listing 103.03C.

8

"medical expert review has not found that the claimant's conditions medically equal the listings." (ALJ Decision, ECF No. 11-3 at 31). However, this omission does not require a remand if other portions of the ALJ's opinion, along with the evidence referenced therein, support his conclusion. *Otts v. Comm'r of Soc. Sec.*, 249 Fed.Appx. 887, 889 (2d Cir. 2007) ("While the ALJ might have been more specific in detailing the reasons for concluding that Otts's condition did not satisfy a listed impairment, the referenced medical evidence, together with the lack of compelling contradictory evidence from the plaintiff, permits us to affirm this part of the challenged judgment."); *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (concluding ALJ's decision was supported by substantial evidence "in spite of the ALJ's failure to explain his rejection of the claimed listed impairments" based on "other portions of the ALJ's decision and . . . clearly credible evidence"). I must therefore look to the remainder of the ALJ's decision and the evidence he relied upon in determining whether D.D.'s impairments medically equaled Listing 103.03D. As noted previously, a claimant may only qualify for benefits by demonstrating that his impairments are "equivalent" to a listing if he "present[s] medical findings equal in severity to *all* the [required] criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531.

I conclude that the ALJ's summary conclusion was supported by substantial evidence. First, the doctors consulted in this case uniformly rejected the claim that D.D.'s impairments met or medically equaled any of the listings. *See Steward v. Bowen*, 858 F.2d 1295, 1298-1299 (7th Cir. 1988) (rejecting claimant's equivalence claim in part on basis that all consulting physicians involved in case had concluded claimant's impairment did not medically equal listing). Drs. Firooz Golkar, William P. Silberberg, and Maria Lorenzo all concluded that D.D.'s impairments did not medically equal any of the listings. (ECF No. 11-8 at 33, 84; ECF No. 11-9 at 38). This

9

is likely what the ALJ was referring to in stating that "medical expert review has not found that the claimant's conditions medically equal the listings." (ECF No. 11-3 at 31). Ms. Green does not point to any medical evidence in the record indicating to the contrary.

Second, Ms. Green does not make any argument as to why D.D.'s low weight is equivalent to the listing's low height requirement in terms of severity. Without medical evidence—or any other evidence for that matter—demonstrating that when paired with asthma low weight is clinically equivalent or "closely analogous" to low height in some meaningful way, I cannot conclude that the ALJ erred in rejecting such a connection. 20 C.F.R. § 416.926; *Martinez Nater v. Sec'y of Health & Human Servs.*, 933 F.2d 76, 77-78 (1st Cir. 1991) (noting that "equivalency may occur where the claimant suffers from an impairment for which a listing exists and, while one or more of the specified medical findings is missing from the evidence[,] . . . other medical findings of equal or greater clinical significance and relating to the same impairment are present in the medical evidence") (internal quotation marks omitted).

The ALJ's determination that D.D.'s impairments did not medically equal Listing 103.3D was therefore supported by substantial evidence.

### 3. 105.08

Ms. Green avers that the ALJ erred in rejecting her contention that D.D.'s impairments equaled Listing 105.08. It appears that the ALJ did not specifically address this contention in his ruling, but this was harmless error. At the time of the hearing, Listing 105.08 applied to any child with "[m]alnutrition due to any digestive disorder" with the following other conditions:

> A. Chronic nutritional deficiency despite continuing treatment as prescribed, present on at least two evaluations at least 60 days apart within a consecutive 6–month period, and documented by one of the following:
>
>> 1. Anemia with hemoglobin less than 10.0 g/dL; or
>> 2. Serum albumin of 3.0 g/dL or less; or

10

>   3. Fat-soluble vitamin, mineral, or trace mineral deficiency;
>
> AND
>
>   B. Growth retardation documented by one of the following:
>
>> 1. For children who have not attained age 2, multiple weight-for-length measurements that are less than the third percentile on the CDC's most recent weight-for-length growth charts, documented at least three times within a consecutive 6–month period; or
>> 2. For children age 2 and older, multiple Body Mass Index (BMI)-for-age measurements that are less than the third percentile on the CDC's most recent BMI–for-age growth charts, documented at least three times within a consecutive 6–month period.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 105.08 (Effective January 2, 2015 to May 17, 2015). Ms. Green concedes that D.D. did not meet the requirements of this listing given his lack of a digestive disorder. She nonetheless contends that his low body mass index ("BMI") medically equaled the listing, focusing in particular on part B.2 quoted above. (ECF No. 17-1 at 16). This argument fails for two reasons. First, my analysis from the previous section addressing Listing 103.03D is fully applicable here, as Ms. Green once again does not point to any evidence—medical or otherwise—supporting her claim of equivalency. Second, even if she did, Listing 105.08 required satisfaction of *both* 105.08A *and* 105.08B. Ms. Green does not speak of how D.D.'s low BMI could satisfy 105.08A, which describes "[c]hronic nutritional deficiency despite continuing treatment as prescribed." Moreover, the medical records from periodic checkups belie any suggestion that D.D. suffered from "chronic nutritional deficiency" or even that his low BMI was regarded as a serious problem. (*See, e.g.*, ECF No. 11-8 at 116 (apart from inability to make physical therapy appointments, "Child is otherwise doing very well" and is "well built and nourished"), 118 ("Eating well" and "Generally well appearing, well built and nourished"), 120 ("General appearance: well built and nourished"), 122 ("General appearance: well built and nourished"), 124 ("Eating well" and "General appearance: Generally well appearing, well built

11

and nourished"), 128 ("General appearance: alert well built and nourished [g]enerally well appearing")).

Given Ms. Green's failure to point to any evidence in the record in support of her claim that D.D. medically equaled Listing 105.08, the ALJ's failure to address the listing was harmless error and does not warrant a remand of the case. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (citing lower court cases, including *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997) (affirming Commissioner in Social Security case involving claim of child disability where claimant failed to show prejudice from ALJ's "marginal" conduct of administrative hearing))).

### b. Functional Equivalence to a Listed Impairment

Ms. Green also argues that the ALJ erred in not finding that D.D. functionally equaled a listed impairment. (ECF No. 17-1 at 17). In particular, she contends that D.D. suffers from a marked limitation in two of the six domains of functioning—caring for yourself and health and physical well-being. (*Id.*). I address each domain in turn.

#### 1. Caring for Yourself

Under the regulations promulgated by the Commissioner, the domain of caring for yourself concerns "how well [claimants] maintain a healthy emotional and physical state, including how well [they] get [their] physical and emotional wants and needs met in appropriate

ways; how [they] cope with stress and changes in [their] environment; and whether [they] take care of [their] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). Examples of limited functioning in the domain of caring for yourself include:

> (i) You continue to place non-nutritive or inedible objects in your mouth.
> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
> (v) You do not spontaneously pursue enjoyable activities or interests.
> (vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3)(i-vi). Ms. Green argues the ALJ's determination "was not supported by good reasons and [that] he ignored other pertinent factors" concerning D.D.'s impairments. (ECF No. 17-1 at 20). The ALJ's conclusion rested chiefly on his determination that D.D. had the capacity to care for himself in several areas. He noted that although D.D. had some difficulty in dressing himself, "he was making progress in this area as he [was] now able to put on his own underwear and [was] working towards putting on his own socks." (ALJ Decision, ECF No. 11-3 at 29). The ALJ also concluded that D.D. was able "to communicate his own needs in school" and to "manage his own frustrations." (*Id.* at 30). Finally, the ALJ highlighted the fact that although Ms. Green had testified that D.D. would "become frustrated by his physical limitations at times," she also "stated that he is able to adapt." *Id.*

I conclude that substantial evidence supports the ALJ's conclusion that D.D. did not have a marked limitation in the domain of caring for yourself. As an initial matter, all of the medical consultants that passed judgment upon D.D.'s limitation in this domain concluded that he did not have a marked limitation. (*See* ECF No. 11-8 at 33-34, 85-87; ECF 11-9 at 39). In particular,

13

Dr. Maria Lorenzo and Adrian Brown, PhD noted most of the deficiencies that Ms. Green raises but still concluded that D.D. possessed a less than marked limitation. (ECF No. 11-8 at 87). The reports completed by D.D.'s teachers also speak to his capabilities in this domain. D.D.'s special education teacher noted that he did not have any problems in the domain of caring for himself save for some difficulty in reaching the soap and towel dispensers, along with buckling his belt. (ECF No. 11-7 at 115 ("functioning appears age-appropriate")). His kindergarten teacher also rated D.D.'s capabilities in caring for himself highly, noting that she had "not seen any issues with [D.D.] caring for himself at school." (*Id.* at 123). Also, D.D.'s impairments do not appear to match the severity of the examples provided in 20 C.F.R. § 416.926a(k)(3)(i-vi). The closest analog is D.D.'s difficulty dressing himself, *compare* 20 C.F.R. § 416.926a(k)(3)(iii) ("You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain."), but, as the ALJ noted, D.D. is improving in this area. (*See* ECF No. 11-3 at 63-64).

Thus, substantial evidence supports the ALJ's conclusion that D.D. did not have a marked limitation in the domain of caring for yourself.

### 2. Health and Physical Well-Being

The regulations promulgated by the Commissioner describe the domain of health and physical well-being as "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning. . . ." 20 C.F.R. § 416.926a(l). Examples of limitations in this domain include the following:

> (i) You have generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of your impairment(s).
> (ii) You have somatic complaints related to your impairments (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).

> (iii) You have limitations in your physical functioning because of your treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).
> (iv) You have exacerbations from one impairment or a combination of impairments that interfere with your physical functioning.
> (v) You are medically fragile and need intensive medical care to maintain your level of health and physical well-being.

20 C.F.R. § 416.926a(l)(4)(i-v). Ms. Green argues that the cumulative effect of D.D.'s impairments demonstrates that he had a marked limitation in this domain. In particular, she notes that D.D.'s medical records show that he has received "continuous respiratory treatment including daily steroids for a sustained period of his life for his chronic respiratory ailments." (ECF No. 17-1 at 22). She also highlights his low weight, vision impairments, and relatively frequent upper respiratory infections. (*Id.*). Finally, she emphasizes D.D.'s 16.5 percent absentee rate during the school year running from August of 2014 to mid-April of 2015. (*Id.* at 23). The cumulative effect of all of these ailments, in Ms. Green's estimation, rendered D.D. "a medically fragile child" with a marked limitation in this domain. (*Id.*).

The ALJ's decision to the contrary rested upon his observation that D.D. was able to function effectively without ongoing intensive medical treatment. While the ALJ noted that D.D. received regular monitoring for his asthma and low weight, he highlighted the fact that D.D. had "not required inpatient hospitalization for his symptoms." (ALJ Decision, ECF No. 11-3 at 30). The ALJ also noted that D.D.'s special education teacher had reported that he did not have "inhaled medications at school." (*Id.*). Finally, the ALJ emphasized that "no treating source has recommended that [D.D.'s] activities be restricted and he is noted to be an active child." (*Id.*).

Although the record demonstrates that D.D.'s impairments caused him some difficulty in this domain, it does not suggest that the ALJ's decision was unsupported by substantial evidence.

15

First, none of the medical experts consulted about this case determined that D.D. had a marked limitation in this domain. (*See* ECF No. 11-8 at 36, 87; ECF No. 11-9 at 39). In reaching this conclusion, Dr. Golkar and speech pathologist Jean Parker concluded that D.D. had "mild asthma, controlled with meds," and that there were "no documented frequent attacks or any exacerbation." (ECF No. 11-8 at 36). Doctor Lorenzo and Adrian Brown noted each of D.D.'s impairments in their report but nonetheless concluded that D.D. did not have a marked limitation in the domain of health and physical well-being. (ECF No. 11-8 at 87). Dr. Silberberg found that although D.D.'s medical records demonstrated the presence of "gross motor delay," there was "a paucity of medical evidence and nothing that describes the delay as serious/marked." (ECF No. 11-9 at 38). Second, observations of D.D.'s teachers are consistent with these findings. D.D.'s kindergarten teacher wrote "n/a" when asked to describe any "chronic or episodic condition" that affected D.D. at school and noted that he did not use an inhaler at school, although she also noted that he had missed almost two weeks of school due to the flu. (ECF No. 11-7 at 124). While D.D.'s special education teacher noted that he missed "lots of school due to chronic illness" in evaluating his health and physical well-being, she also noted he was "picking up basis skills very well. . . . (ECF No. 11-7 at 116). Although Ms. Green testified about the difficulties that afflicted D.D. due to his impairments (ECF No. 11-3 at 50-52, 72-74. 79), this countervailing evidence in the record is sufficient to support the ALJ's determination.

For these reasons, the ALJ's determination that D.D. did not suffer from a marked limitation in the domain of physical health and well-being was supported by substantial evidence.

## IV. Conclusion

For the reasons set forth above, Ms. Green's motion for an order reversing the Commissioner's decision (ECF No. 17) is DENIED, and the Commissioner's motion to affirm that decision (ECF No. 21) is GRANTED. The case is dismissed.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           January 8, 2018